## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TOASTIQUE HOLDINGS, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Case No. 1:24-cv-03611** |
| | § | |
| **C & G RESTAURANT HOLDINGS,** | § | |
| **INC., CARRIE M. CARRETTA, and** | § | |
| **RICHARD L. GIAMBASTINI, JR.,** | § | |
| | § | **Judge Amit P. Mehta** |
| **Defendants.** | § | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Toastique Holdings, LLC ("Plaintiff" or "Toastique") files this First Amended Complaint against Defendants C & G Restaurant Holdings, Inc. ("C & G"), Carrie M. Carretta ("Carretta"), and Richard L. Giambastini, Jr. ("Giambastini") (collectively, "Defendants"), and would respectfully show the Court as follows:

### I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

2.    Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, and also because the parties to this action have contractually agreed that venue is proper in this Court.

3.    To the extent declaratory relief is sought in this Complaint, such relief is authorized by 28 U.S.C § 2201.

## II.    PARTIES

4.      Toastique is a corporation formed under the laws of the state of Arizona with its principal place of business in the District of Columbia.

5.      Defendant C & G is a corporation formed under the laws of the state of Texas with its principal place of business in Austin, Texas. C & G may be served via its registered agent, Carrie Marie Carretta, at 414 Sitlington Lane, Lakeway, TX 78738, or wherever she may be found.

6.      Defendant Carretta is an individual residing in Travis County, Texas and may be served at 414 Sitlington Lane, Lakeway, TX 78738, or wherever she may be found.

7.      Defendant Giambastini is an individual residing in Travis County, Texas and may be served at 414 Sitlington Lane, Lakeway, TX 78738, or wherever he may be found.

## III.    FACTS

### A.      Background and the Franchise Agreement

8.      Toastique is engaged in the business of franchise restaurant sales and development. As part of this business, Toastique has developed a distinctive and proprietary system (the "System") for the establishment, development, and operation of a gourmet fast-casual toast and juice bar that serves toast-style meals, fruit bowls, juices, smoothies, and other menu items that Toastique authorizes. *See* **Exhibit A**, TOASTIQUE 00005.

9.      Toastique enters into franchise agreements with its franchisees in which it agrees, among other things, to provide them with access to the System in exchange for, among other things, the franchisees' payments and agreement to operate their individual franchised restaurants in accordance with the System.

10.     On or about June 6, 2023, Toastique entered into a Franchise Agreement with C & G for C & G to become a Toastique franchisee. The Franchise Agreement is signed by Carretta and

2

Giambastini on behalf of C & G. Toastique and C & G are respectively referred to in the Franchise Agreement as "Franchisor" and "Franchisee." *See id.*, TOASTIQUE 00073.

11.     Upon information and belief, prior to executing the Franchise Agreement, Carretta and Giambastini lacked any experience owning or operating a restaurant or other food service business of any kind.

12.     Under Article 2.A(1) of the Franchise Agreement, "Franchisee accepts, the non-exclusive license, right and ***obligation*** to develop and operate, one Toastique Restaurant in conformity with the System and this Agreement from a single fixed restaurant location, selected by Franchisee but requiring the approval of Franchisor ("Franchisee's Restaurant Location")." *Id.*, TOASTIQUE 00015 (emphasis added).

13.     A separate schedule of the Franchise Agreement, signed by Carretta and Giambastini on behalf of C & G, designates the "Franchisee's Restaurant Location" as 2620 Perseverance Drive, Austin, TX 78731. *See* **Exhibit B**, TOASTIQUE 00115.

14.     Under Article 2.A(6) of the Franchise Agreement, "Franchisee may only offer and sell the Approved Services and Products from Franchisee's Restaurant Location in accordance with the requirements set forth in the Operations Manual…." *See* **Exhibit A**, TOASTIQUE 00016.

15.     "Approved Services and Products" are defined in the Franchise Agreement as "a gourmet fast casual toast and juice bar serving a fresh, seasonal and responsibly sourced menu of toast style meals, fruit bowls, juices, smoothies and other menu items that Franchisor authorizes" as well as "those products and services that Franchisor authorizes for sale by Toastique Restaurants….***The Franchised Business may only offer and sell the Approved Services and Products.***" *See id.*, TOASTIQUE 00005-06 (emphasis added).

3

16.     Furthermore, "The Operations Manual, subject to changes that Franchisor may make from time to time and Franchisor's right to change and modify the Approved Services and Products, shall designate the Approved Services and Products that must be offered and sold by the Franchised Business." *Id.*, TOASTIQUE 00006.

17.     "Operations Manual" is defined as "the manual(s) designated by Franchisor and relating to the development and/or operations of Toastique Restaurants including, but not limited to, the policies, procedures and requirements for the development and operation of Toastique Restaurants." *Id.*, TOASTIQUE 00007.

18.     Toastique develops and provides to franchisees various documents that constitute "Operations Manuals" under the Franchise Agreement, all of which describe proprietary, confidential, and/or trade-secret information regarding the details of how to operate a Toastique franchise location, including how to prepare and serve Toastique's unique menu items.

19.     Under Article 3.A of the Franchise Agreement, C & G agrees to

develop, operate and manage the Franchised Business from a Restaurant Facility that is developed and established at a Restaurant Location, that:

…

(b) complies with the terms and conditions of this Agreement;

(c) satisfies and meets Franchisor's standards and specifications;

…

(g) is and, at all times, shall be ***exclusively dedicated to the operation of the Franchised Business***….

*Id.*, TOASTIQUE 00017-18 (emphasis added).

20.     Under Article 3.D of the Franchise Agreement, C & G agrees that,

At all times, the Franchised Business shall:

…

4

(c) exclusively offer and sell the Approved Services and Products as designated by Franchisor, in Franchisor's Reasonable Business Judgment, and as modified by Franchisor from time to time;

…

(e) exclusively utilize, maintain and stock in inventory the System Supplies in such quantities and as designated by Franchisor…;

(f) exclusively purchase the System Supplies from the suppliers and vendor(s) approved by Franchisor and designated by Franchisor…;

…

(h) be operated in conformity with the Operations Manual….

…

Franchisee agrees that control over the nature, quality, branding and source of the System Supplies is critical to the System and that irrespective of the availability of substitute products, supplies, inventory, apparel and/or accessories, Franchisee shall only utilize the System Supplies as designated by Franchisor and only from those suppliers approved by Franchisor.

*Id.*, TOASTIQUE 00019-20.

21.    "System Supplies" is defined as

those food, ingredients (including raw, partially prepared and prepared seasonings, sauces, mixes, beverages and food products used to prepare the Approved Services and Products), supplies and equipment including, but not limited to, branded packaging, paper goods, materials, uniforms, displays, menu boards and merchandise, designated by Franchisor in the Operations Manual….

*Id.*, TOASTIQUE 00013-14.

22.    Under Article 3.E of the Franchise Agreement, C & G agrees that,

At all times, ***Franchisee shall exclusively use the Business Management Systems designated by Franchisor****….Franchisee cannot substitute or replace the Business Management System in favor of any substitutes or other systems.

…

Supplementing the foregoing, Franchisee agrees that ***the Business Management System will contain proprietary and confidential information owned by Franchisor and related to the System***, and that:

5

(1) Franchisee shall use the Business Management System and the Business Management System Data ***for the exclusive benefit of the Franchised Business*** and in accordance with the terms of this Agreement and Franchisor's standards and specifications as set forth in the Operations Manual;

(2) All rights in and to the Business Management System are non-transferable and non-assignable to Franchisee and shall be utilized by Franchisee subject to the terms and conditions of this Agreement, Business Management System licenses that Franchisor may approve of and otherwise as determined by Franchisor in Franchisor's Reasonable Business Judgment;

(3) As between Franchisee and Franchisor, Franchisor is and shall be the exclusive owner of the Business Management System Data…

(4) At all times, Franchisee shall provide and permit Franchisor to maintain direct and independent access to the Business Management System and Franchisee shall electronically transfer and transmit to Franchisor all Business Management System Data;

…

(7) Other than permitting access to employees of the Franchised Business for the purpose of conducting the authorized operations of the Franchised Business, Franchisee shall not permit nor allow any third party to access, utilize or duplicate the Business Management System or the Business Management System Data without Franchisor's prior written consent;

(8) Franchisee shall keep and maintain the Business Management System and the Business Management System Data as secret and confidential and Franchisee shall maintain security precautions to maintain the confidentiality and secrecy of the Business Management System Data and to prevent the unauthorized access or use….

*Id.*, TOASTIQUE 00020-21 (emphasis added).

23.    Under Article 4.C of the Franchise Agreement,

Franchisee must operate the Franchised Business in accordance with the specifications and requirements set forth in the Operations Manual….***Franchisee shall not duplicate or distribute the Operations Manual and/or its content*** and, at all times, Franchisee must keep and maintain all media containing the Operations Manual and its content in a secure location at Franchisee's Restaurant that is not accessible to any individual not authorized to view or access same.

*Id.*, TOASTIQUE 00025 (emphasis added).

24.     Under Article 5.B of the Franchise Agreement, throughout the term of the Agreement, Toastique is entitled to "a continuing weekly non-refundable royalty fee (the "Royalty Fee") in an amount equal to 6% (the "Royalty Rate") of Franchisee's weekly Gross Sales." *Id.*

25.     Under Article 6.A of the Franchise Agreement,

> Franchisee agrees that only through the course of entering into this Agreement is Franchisee being provided with access to the System, Franchisor's training, use of the Licensed Marks and access to the Operations Manual and Confidential Information. ***Franchisee agrees that competition by Franchisee, Owners, Spouses and Immediate Family Members could jeopardize the entire System and cause irreparable harm to Franchisor and franchisees of Toastique Restaurants***. Accordingly, Franchisee and Franchisee's Owners and Spouses agree to comply with the restrictive covenants set forth in this Article 6 and throughout this Agreement.

*Id.*, TOASTIQUE 00028 (emphasis added).

26.     "Confidential Information" is defined as

> all of Franchisor's and Franchisor's affiliates trade secrets, methods, standards, techniques, procedures, data and information, as same may exist as of the Effective Date of this Agreement and as same may be developed, modified and supplemented in the future, constituting and comprising: (a) ***methods, specifications, recipes, standards, policies, procedures, information, concepts, programs and systems*** relating to the development, establishment, marketing, promotion and operation of Toastique Restaurants; (b) information concerning consumer preferences for services, products, materials and supplies used or sold by, and specifications for and knowledge of suppliers of certain materials, equipment, products, supplies and procedures used or sold by Toastique Restaurants; (c) information concerning customers, customer lists, email lists, database lists, product sales, operating results, financial performance and other financial data of Toastique Restaurants; (d) customer lists and information related to Toastique Restaurants and the Franchised Business; (e) Business Management System Data; (f) ***recipes***; (g) current and future information contained in the Operations Manual; and (h) ***Know-How***.

*Id.*, TOASTIQUE 00007 (emphasis added)

27.     Under Article 6.B of the Franchise Agreement,

> Franchisee agrees that, at all times, both during the Term of this Agreement and after its expiration or termination, Franchisee: (a) ***shall not use the Know-How in any business or capacity other than the operation of the Franchised Business pursuant to this Agreement***; (b) ***shall maintain the confidentiality of the Know-How at all times***; (c) shall not make unauthorized copies of documents containing

7

any Know-How; (d) shall take all reasonable steps that Franchisor requires from time to time to prevent unauthorized use or disclosure of the Know-How; and (e) ***shall stop using the Know-How immediately upon the expiration, termination or Transfer of this Agreement***. Franchisee agrees that the foregoing covenants and obligations shall also apply to: (a) Franchisee's Owners and Spouses and that Franchisee's Owners and Spouses shall each execute and deliver to Franchisor the Franchise Owner and Spouse Agreement and Guaranty in the form attached to this Agreement as Exhibit 1; and (b) Franchisee's directors, officers, employees and agents where disclosure of the Know-How was necessary for the operations of the Franchised Business and where such director, officer, employee and/or agent previously executed and delivered to Franchisor the Confidentiality Agreement.

*Id.*, TOASTIQUE 00028-29 (emphasis added).

28.     "Know-How" is defined as

Franchisor's trade secrets and proprietary information relating to the development, establishment, marketing, promotion and/or operation of a Toastique Restaurant including, but not limited to, methods, techniques, recipes, specifications, food preparation, procedures, policies, marketing strategies and information reflected in, included in, comprising and/or constituting a part of the System. Without limitation to the foregoing, Know-How shall further include information contained in the Operations Manual and the Confidential Information.

*Id.*, TOASTIQUE 00010.

29.     Under Article 6.C of the Franchise Agreement,

Franchisee agrees that Franchisee: (a) ***shall not use the Confidential Information in any business or capacity other than the Toastique Restaurant operated by Franchisee***; (b) ***shall maintain the confidentiality of the Confidential Information at all times***; (c) ***shall not make unauthorized copies of documents containing any Confidential Information***; (d) shall take such reasonable steps as Franchisor may ask of Franchisee from time to time to prevent unauthorized use or disclosure of the Confidential Information; and (e) shall stop using the Confidential Information immediately upon the expiration, termination or Transfer of this Agreement.

*Id.*, TOASTIQUE 00029 (emphasis added).

30.     Under Article 6.D of the Franchise Agreement,

Franchisee agrees that during the Term of this Agreement, Franchisee shall not engage in the following activities (the "Prohibited Activities"): (a) ***owning and/or having any legal or equitable interest…in a Competitive Business***…; (b) ***operating, managing, funding and/or performing services*** (whether as an employee, officer, director, manager, consultant, representative, agent, and/or

8

creditor or in any similar capacity) *for a Competitive Business*; (c) *diverting or attempting to divert any business or customers from Franchisor* (or one of Franchisor's affiliates or franchisees); and/or (d) *inducing any customer or client of Franchisor's (or of one of Franchisor's affiliates or franchisees) or of Franchisee to any other person or business that is not a Toastique Restaurant.* Franchisee agrees that if Franchisee were to engage in the Prohibited Activities that such actions would be unfair, would constitute unfair competition and would cause harm to Franchisor, the System and other Toastique Restaurant Franchisees.

*Id.* (emphasis added).

31.    "Competitive Business" is defined as "any restaurant that is the same as or similar to a

Toastique Restaurant including any business or restaurant…that operate[s] as a restaurant that

offers, sells and/or provides gourmet sandwiches, fruit bowls, smoothies and/or fresh juice style

menu items."

*Id.*, TOASTIQUE 00007.

32.    Under Article 6.E of the Franchise Agreement,

Franchisee agrees that during the Post-Term Restricted Period Franchisee will not engage in any Prohibited Activities; provided, however, that the Prohibited Activity relating to having an interest in a Competitive Business will only apply with respect to a Competitive Business that is located within or provides competitive goods or services to customers/clients who are located within the Restricted Territory….Franchisee agrees that this restriction is fair and reasonable and that *if Franchisee did engage in a Prohibited Activity that such actions would constitute acts of unfair competition and will irreparably harm Franchisor and the System*.

*Id.*, TOASTIQUE 00029-30 (emphasis added).

33.    "Restricted Territory" is defined in part as "the geographic area…comprising Franchisee's

Designated Territory…." *Id.*, TOASTIQUE 00012.

34.    Under Article 6.G of the Franchise Agreement,

Franchisee agrees that: (a) the terms of this Article 6 are reasonable both in time and in scope of geographic area; and (b) Franchisee has sufficient resources and business experience and opportunities to earn an adequate living while complying with the terms of this Article 6. **Franchisee hereby waives any right to challenge the terms of this Article 6 as being overly broad, unreasonable or otherwise unenforceable.**

*Id.*, TOASTIQUE 00030.

35.     Under Article 6.H of the Franchise Agreement,

Franchisee agrees that Franchisee's failure and/or Franchisee's Owner(s) failure to comply with the restrictive covenants and obligations set forth in this Article 6 ***will cause irreparable harm to Franchisor and/or other Toastique Restaurant franchisees for which there is no adequate remedy at law.*** Therefore, Franchisee agrees that ***any violation of these Article 6 covenants and obligations by either Franchisee and/or any Owner(s) will entitle Franchisor to injunctive relief.*** Franchisee agrees that ***Franchisor may apply for such injunctive relief, without bond***….If a court requires the filing of a bond notwithstanding the preceding sentence, the Franchisee and Franchisor agree that the amount of the bond shall not exceed $1,000. Franchisor's remedies under this Article 6.H. are not exclusive of any other, but may be combined with others under this Agreement, or at law or in equity, including injunctive relief, specific performance and recovery of monetary damages.

*Id.*, TOASTIQUE 00030-31 (emphasis added).

36.     Under Article 6.I of the Franchise Agreement,

During the Term of this Agreement and in connection with the development, establishment, marketing, promotion and operation of the Franchised Business, Franchisee shall disclose to Franchisor all of Franchisee's ideas, concepts, methods and products conceived or developed by Franchisee and Franchisee's affiliates, Owners, agents, and employees relating to the development and operation of Toastique Restaurants. Franchisee hereby assigns to Franchisor and Franchisee agrees to procure from Franchisee's Owners, affiliates and employees assignment of any such ideas, concepts, recipes, methods, and products that Franchisee is required to disclose to Franchisor under this Article 6.I….***Franchisee agrees that Franchisee will not use nor will Franchisee allow any other person or entity to use any such concept, method or product without obtaining Franchisor's prior written approval***.

*Id.*, TOASTIQUE 00031 (emphasis added).

37.     Under Article 7.A of the Franchise Agreement,

Franchisee and the Franchised Business shall: (a) ***exclusively offer and sell the Approved Services and Products as designated by Franchisor*** in the Operations Manual and/or as otherwise designated by Franchisor…; (b) ***exclusively operate the Restaurant in accordance with the standards, specifications, and operational requirements as designated by Franchisor*** in this Agreement, the Operations Manuals, and/or as otherwise designated by Franchisor in writing and as may be modified by Franchisor from time to time; [and] (c) exclusively purchase and use

the System Supplies as designated by Franchisor in the Operations Manual and as may be modified by Franchisor from time to time….

*Id.* (emphasis added).

38.    Under Article 7.E of the Franchise Agreement, "***Franchisee shall not make any material alterations*** to Franchisee's Restaurant Facility without Franchisor's prior written consent. Franchisee shall not replace or make any unapproved replacements of or material alterations to the fixtures, equipment, furniture, designs or signs, comprising or being a part of Franchisee's Restaurant Facility." *Id.*, TOASTIQUE 00032 (emphasis added)

39.    Article 7.F of the Franchise Agreement describes various requirements for operating the Franchised Business that C & G "must use its best efforts" to follow "in strict conformity with the methods, standards and specifications" of Toastique. Those requirements include:

- "***Exclusively offer and sell the Approved Services and Products***";

- "***Exclusively use packaging, signs, menus, menu boards, paper goods, uniforms, and other materials displaying the Licensed Marks*** as designated by Franchisor…";

- "Conduct all advertising and promotion of the Franchised Business in strict compliance with Franchisor's standards and specifications…";

- "***Refrain from any business or advertising practice that may be injurious to the goodwill associated with Franchisor, Toastique Restaurants, the System, and the Licensed Marks***";

- "Not deviate from the standards that Franchisor sets for the operation of the Franchised Business";

- "***Adopt, implement, and abide by the System*** and all changes made to the System (as designated by Franchisor in Franchisor's Reasonable Business Judgment) including, without limitation, the Approved Services and Products and the System Supplies"; AND

11

- "***Not promote any other businesses at the Franchised Business, and/or from Franchisee's Restaurant Facility, and/or Franchisee's Restaurant Location***…."

*Id.*, TOASTIQUE 00032-34 (emphasis added).

40.     Article 7.J of the Franchise Agreement requires that C & G "must, at all times, faithfully, honestly and diligently perform its obligations hereunder, and ***continuously exert its best efforts to promote and enhance the business of the Franchised Business*** and the goodwill of the Licensed Marks," meaning the Toastique trade names, trademarks, trade dress, and other branding and intellectual property. *See id.*, TOASTIQUE 00037 (emphasis added).

41.     The Franchise Agreement further addresses the use of the Licensed Marks, stating in Article 11.A that "[a]ny unauthorized use of the Licensed Marks and/or the System by Franchisee or any of Franchisee's affiliates shall constitute an infringement of the rights of Franchisor in and to the Licensed Marks and/or the System," and further stating in Article 11.B that "***the Licensed Marks shall be the sole identification of the Franchised Business.*** Franchisee must operate, advertise and market the Franchised Business ***only under the Licensed Marks*** as designated and specified by Franchisor…." *See id.*, TOASTIQUE 00046.

42.     The Franchise Agreement may be terminated by Toastique on various grounds, including, as set forth in Article 16.A(2):

- If C & G "intentionally and knowingly, refuses to comply with and/or breaches any term, condition, provision, and/or requirement of this Agreement with the intent of causing harm to Franchisor, the System, other System franchisee and/or customers of the Franchised Business";

- If C & G "***abandons, surrenders and/or fails to continuously and actively operate the Franchised Business***";

- If C & G "*discloses, divulges, provides access to, communicates, and/or permits the communication of Confidential Information* to any third party not otherwise authorized by Franchisor";

- If C & G "*engages in any activity that injures, harms, damages, or otherwise has a material adverse effect on Franchisor*, the System, the Licensed Marks, Toastique Restaurants, Franchisee's Restaurant, and/or the reputation of the Toastique brand";

- If C & G, "an Owner, and/or a Spouse, as applicable and whether individually or jointly, breaches or is in default of an Ancillary Agreement"; or

- If C & G "*misappropriates, misuses, or makes any unauthorized use of the Licensed Marks, the Confidential Information, and/or the System*" and/or "materially impairs the goodwill associated with the Licensed Marks…."

*Id.*, TOASTIQUE 00057-59 (emphasis added).

43.    Toastique's rights and remedies in the event of C & G's default under the Franchise Agreement specifically include the right to "enjoin, restrain, and otherwise prohibit Franchisee from operating Franchisee's Restaurant or exercising any rights granted to Franchisee under this Agreement pursuant to a court order restraining order, injunction or other means." *Id.*, TOASTIQUE 00062.

44.    Under Article 2.C of the Franchise Agreement,

Franchisee agrees that each Owner and their respective Spouse shall execute, sign and deliver to Franchisor the Franchise Owner and Spouse Agreement and Guaranty attached to this Agreement as Exhibit 1 and, in doing so, among other things, will jointly and severally guarantee Franchisee's obligations under this Agreement and personally bind themselves to confidentiality and non-competition covenants and restrictions.

*Id.*, TOASTIQUE 00017.

13

306835461v.1

45.     The Franchise Agreement is governed by and construed under Nevada law. *See id.*, TOASTIQUE 00067.

46.     Although disputes under the Franchise Agreement are generally subject to a requirement of non-binding mediation, that requirement does not apply to "any claims or disputes related to or concerning a breach of this Agreement by Franchisee that, under the terms of this Agreement, may entitle Franchisor to the award of injunctive relief…." *Id.*, TOASTIQUE 00068.

47.     Likewise, although arbitration is generally required under the Franchise Agreement if mediation fails, that requirement does not apply to claims for which injunctive relief may be awarded to Toastique. *See id.*

48.     Finally, the Franchise Agreement contains a choice-of-venue clause designating the state or federal courts of Washington, D.C. as the forum for disputes to be resolved in court. *See id.*, TOASTIQUE 00069.

**B.      The Guaranty**

49.     In addition to the main Franchise Agreement, Exhibit 1 of the Agreement, titled "Franchise Owner and Spouse Agreement and Guaranty" (the "Guaranty") extends the obligations of C & G under the Franchise Agreement to Carretta and Giambastini individually. *See id.*, TOASTIQUE 00076-89.

50.     The Guaranty is signed by both Carretta and Giambastini individually. *See id.*, TOASTIQUE 00089.

51.     By signing the Guaranty, Carretta and Giambastini acknowledge that they are personally obligated "to guarantee Franchisee's obligations" to Toastique and to comply with "brand protection, confidentiality and non-competition restrictions and covenants…." *Id.*, TOASTIQUE 00077.

52.     Under the Guaranty, Carretta and Giambastini agree that they will "***not use the Know-How in any business or capacity other than the Franchised Business***" and "maintain the confidentiality of the Know-How at all times…." *Id.*, TOASTIQUE 00083 (emphasis added).

53.     Carretta and Giambastini also agree not to engage in any "Prohibited Activities," i.e., competition with Toastique, both during the parties' franchise relationship and afterwards. Carretta and Giambastini further agree that, "if you did engage in a Prohibited Activity that such actions would constitute acts of unfair competition and will irreparably harm us and the System," and "will cause irreparable harm to us and/or other Restaurant franchisees for which there is no adequate remedy at law." *Id.*, TOASTIQUE 00083-84.

54.     Caretta and Giambastini further agree under the Guaranty that "[a]ny claim, defense or cause of action that you may have against us or against Franchisee, regardless of cause or origin, cannot be used as a defense against our enforcement of this Agreement." *Id.*, TOASTIQUE 00088.

**C.      Defendants' Breach of the Agreements**

55.     Following their execution of the Franchise Agreement and Guaranty, Defendants were given access to Toastique's Operations Manual, Recipe Books, branding guidelines and materials, menus, and other proprietary information and resources solely intended to be used in operating a Toastique franchise restaurant at the Franchisee's Restaurant Location. However, Defendants apparently became disgruntled with their decision to purchase a Toastique franchise.

56.     As part of Toastique's operations, each Toastique franchise is required to report its daily gross sales to Toastique at the end of business hours. On or about December 15, 2024, Toastique became aware that C & G was not reporting any gross sales for the day—an indicator that the restaurant had not opened that day.

57.    On or about December 18, 2024, Toastique became aware, via social media posts made by or on behalf of Defendants, that Defendants had closed the Toastique restaurant at the Franchisee's Restaurant Location and reopened their own store, "Veranda Café & Mercantile" (the "Veranda Store") *in the exact same location, with slightly altered branding, and a substantially similar menu* to the previous Toastique restaurant.

58.    Subsequent visits to the Veranda Store, as well as further online investigation efforts, have confirmed that the Veranda Store, like a Toastique franchise location, purports to specialize in gourmet food products on toast—the most obviously distinguishing feature of a Toastique franchise restaurant.

59.    In other words, Defendants are currently engaged in operating a competing business to Toastique, in the same location where they were supposed to be operating a Toastique franchise restaurant, using basically the same menu and only slightly altered branding, with know-how they only could have gotten from Toastique, and in obvious violation of the Franchise Agreement and Guaranty.

60.    A notice of termination of Defendants' franchise has been served on counsel for Defendants. However, Defendants clearly intend to continue operating the Veranda Store unless this Court enjoins them from doing so.

61.    Toastique has suffered, and will continue to suffer, harm of various kinds from Defendants' activities, including but not limited to harm to Toastique's business and goodwill, customer confusion and misappropriation, theft and dilution of Toastique's proprietary systems and ways of doing business, harm to Toastique's intellectual property, loss of royalty and other fees, and other harms to be proven at trial.

## IV.    CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT (INJUNCTIVE RELIEF)

62.    Toastique repeats and realleges all the foregoing paragraphs as if fully set forth herein.

63.    Toastique and Defendants entered into the Franchise Agreement and Guaranty.

64.    Toastique and Defendants each gave consideration for the Franchise Agreement and Guaranty.

65.    Toastique has performed its obligations under the Franchise Agreement and Guaranty.

66.    Defendants have breached the Franchise Agreement and Guaranty and defaulted thereunder in numerous ways, including but not limited to:

a.    Failing and refusing to operate a Toastique Restaurant at the Franchisee's Restaurant Location, and instead operating a competing business there;

b.    Failing and refusing to follow Toastique's instructions regarding the products and services to be provided at the Franchisee's Restaurant Location, and the branding, names, trade dress, and other identifying marks that must be used;

c.    Failing and refusing to conduct business under the Toastique name in an apparent attempt to misappropriate Toastique's goodwill and reputation in starting a competing business;

d.    Misappropriating Toastique's proprietary materials, instructions, and know-how intended for exclusive use in operating a Toastique Restaurant and instead using the same to operate a competing business;

e.    Failing and refusing to keep confidential Toastique's proprietary and confidential information submitted to Defendants for the exclusive purpose of operating a Toastique Restaurant;

17

306835461v.1

      f.      Failing and refusing to pay royalties and other fees owed to Toastique; and

      g.      Operating a competing business to Toastique.

67.    As a franchisor, Toastique's product is, in a very real sense, the unique and distinct System it provides to its franchisees that allows for the operation of Toastique franchises. As a result of Defendants' actions, Toastique has been harmed, including loss of an operating Toastique franchise in the Austin area, damage to its reputation among its customers and franchisees, loss and dilution of its intellectual property, loss of the proprietary materials, instructions, recipes, and other information that constitute the Toastique System, and other harms.

68.    Moreover, said harms are ongoing and will continue into the future, and cannot be adequately remedied solely by the post-hoc payment of money damages.

69.    Toastique requests temporary and permanent injunctive relief requiring Defendants to cease operating any business that competes with Toastique in violation of the Franchise Agreement and Guaranty, and other such further relief as is just and proper.

## COUNT II
## DECLARATORY JUDGMENT – NON-COMPETITION

70.    Toastique repeats and realleges all the foregoing paragraphs as if fully set forth herein.

71.    The Franchise Agreement and Guaranty contain non-competition provisions that are limited in geographical scope and in time.

72.    By operating the competing Veranda Store at the Franchisee's Restaurant Location, Defendants are in violation of the Franchise Agreement and Guaranty, including the non-competition provisions.

73.    An actual controversy exists regarding whether Defendants may operate, or continue to operate, the Veranda Store despite the non-competition provisions in the Franchise Agreement and Guaranty.

74.    Toastique is entitled to a declaration that the non-competition provisions in the Franchise Agreement and Guaranty are valid and enforceable, that Defendants are in violation of said provisions, and that Defendants must be enjoined from operating the Veranda Store.

## COUNT III
## DECLARATORY JUDGMENT – STAY OF ARBITRATION

75.    Toastique repeats and realleges all the foregoing paragraphs as if fully set forth herein.

76.    On or about December 23, 2024, counsel for Defendants served on Toastique a demand for arbitration pursuant to certain provisions of the Franchise Agreement and Guaranty that describe arbitration as a process for resolving disputes between the parties.

77.    An actual controversy exists between the parties regarding whether arbitration may proceed in light of the injunctive relief being sought via this Complaint, which relief is specifically excepted from the requirement of arbitration under the Franchise Agreement and Guaranty.

78.    Toastique is entitled to a declaration that any arbitration between the parties must be stayed pending the outcome of Toastique's requests for injunctive relief in this matter.

## COUNT IV
## VIOLATION OF NEVADA UNIFORM TRADE SECRETS ACT (INJUNCTIVE RELIEF)

79.    Toastique repeats and realleges all the foregoing paragraphs as if fully set forth herein.

80.    The Franchise Agreement contains a choice of law provision that provides, in part: "THIS AGREEMENT AND THE RELATIONSHIP BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEVADA, EXCEPT THAT ITS CHOICE OF LAW AND CONFLICTS OF LAWS RULES SHALL NOT APPLY…." *Id.*, TOASTIQUE 00067.

81.    Toastique is the owner of the System including the Know-How derived therefrom, which constitutes one or more "trade secrets" within the meaning of Nev. Rev. Stat. § 600A.030(5).

82.     Toastique has made reasonable efforts to maintain the secrecy of the trade secret(s) that make up the Toastique System.

83.     The Toastique System is a valuable commercial design.

84.     Toastique and Defendants had, and continue to have, a confidential relationship based on the provisions of the Franchise Agreement requiring non-use and non-disclosure of the Toastique System or any portion thereof for any purpose other than the operation of a Toastique restaurant, both during Defendants' tenure as Toastique franchisees and after.

85.     The key features of the Toastique System are the creative product of Toastique.

86.     Defendants have committed, and are continuing to commit, actual or threatened misappropriation of trade secrets belonging to Toastique by, among other things:

    a.  Willfully breaching or willfully inducing the breach of Defendants' duty to maintain secrecy under the Franchise Agreement;

    b.  Acquiring, retaining, and utilizing the Toastique System and the Know-How derived therefrom in the conduct of an unfairly competing business; and

    c.  Disclosing or using the Toastique System and the Know-How derived therefrom without express or implied by consent after having used improper means to acquire and retain knowledge of the same, and/or under circumstances giving rise to a duty to maintain the secrecy or limit the use of the Toastique System and the Know-How derived therefrom.

87.     Toastique is entitled to a temporary and permanent injunctive relief requiring Defendants to cease any use of the Toastique System and the Know-How derived therefrom, including but not limited to the operation of a competing business in the location of Toastique's former franchised

restaurant and the sale, or offering for sale, of any and all food or drink products created or developed using, in any way, the Toastique System and the Know-How derived therefrom.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Toastique Holdings, LLC respectfully prays for the following relief:

1. Temporary and permanent orders enjoining Defendants from operating the Veranda Store or any similar and competing business, from selling, or offering for sale, any and all food or drink products created or developed using, in any way, the Toastique System and the Know-How derived therefrom, and from disparaging, defaming, or otherwise seeking to harm Toastique;

2. A declaration that the non-competition provisions of the Franchise Agreement are valid and enforceable and bind Defendants;

3. A declaration that any arbitration between the parties is stayed pending the outcome of this action;

4. Attorney fees and costs pursuant to Article 18.N of the Franchise Agreement and as otherwise permitted by law;

5. All other such relief that this Court deems just and proper.

306835461v.1

Dated January 13, 2025

Respectfully Submitted,

**WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP**

*/s/ David M. Ross*
David M. Ross (D.C. Bar No. 461733)
Kevin P. Farrell (D.C. Bar No. 492142)
1500 K. Street, N.W., Suite 330
Washington, DC 20005
Telephone:  202.626.7687
Facsimile:  202.628.3606
david.ross@wilsonelser.com
kevin.farrell@wilsonelser.com

Nathan R. White (TX Bar No. 24117284,
application for *pro hac vice* forthcoming)
Santander Tower
1601 Elm Street, Suite 260
Dallas, TX 75201
214.698.8000
214.698.1101 (Facsimile)
nathan.white@wilsonelser.com

**ATTORNEYS FOR PLAINTIFF
TOASTIQUE HOLDINGS, LLC**

22

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing *Plaintiff's First*

*Amended Complaint* was served via the Court's electronic filing system and via email, on this

13th day of January, 2025 upon the following:

**WERTHER & MILLS, LLC**
R. Clark Fonda, Jr.
D.D.C. Bar No. 1779627
2000 Tower Oaks Blvd., Suite 200
Rockville, MD 20852
Phone: 202.503.9276 Fax: 240.912.3031
clark@werthermills.com

**Marks & Klein, LLC**
Andrew P. Bleiman, Esq.
1363 Shermer Road
Suite 318
Northbrook, IL  60062
andrew@marksklein.com
*Attorneys for Defendants*

*/s/ David M. Ross*
David M. Ross

306835461v.1